Filed 7/30/21; Certified for Publication 8/30/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHARLES E. SWENBERG,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>DMARCIAN, INC., et al.,<br><br>          Defendants and Respondents. | A159148<br><br>(San Mateo County<br>Super. Ct. No. 19-CIV-02896) |

Charles Swenberg brought this action against dmarcian, Inc., Timothy Draegen, and Martijn Groeneweg, alleging various claims related to his ownership interest in and employment with the company. This appeal is from the trial court's order granting Groeneweg's motion to quash service for lack of personal jurisdiction. For the reasons explained herein, we reverse and remand.

## BACKGROUND

Dmarcian, Inc. ("dmarcian") was incorporated in Delaware in 2014, and, in 2017, registered with the California Secretary of State as a foreign corporation with its "principal executive office" in Burlingame, California. According to the allegations of the complaint, dmarcian is an "email security provider" and sells "a portfolio of products including software-as-a-service

1

products, compliance products, and technical support."[1]  Draegen is a co-founder of the company, its chief executive officer (CEO) and majority shareholder, and resides and works in North Carolina.  Groeneweg, who resides in the Netherlands, is alleged to be a chief executive of, and have an ownership interest in, "a company whose true name is unknown to Swenberg, but which was a European affiliate entity of dmarcian" and "was referred to colloquially as dmarcian EU."[2]  The complaint alleges on information and belief that Groeneweg is presently a shareholder or beneficial owner of dmarcian.  Swenberg, who resides in California, is a co-founder of dmarcian and worked for the company as a consultant in 2016, then as chief revenue officer (CRO) and finally as chief operating officer (COO) until his termination on May 31, 2018.

Swenberg's complaint alleged that his employment as CRO and COO of dmarcian was governed by a series of oral agreements.  The first agreement, entered by Swenberg and Draegen on or about January 1, 2017, provided

---

[1] Draegen described dmarcian as marketing and selling "an email authentication protocol specification (called 'DMARC') that assists customers in streamlining email communications by filtering out spam, malware, and phishing emails from email inboxes."

[2] Groeneweg's declaration states he is a 25 percent shareholder in dmarcian Europe BV, which he described as (in the same terms Draegen described dmarcian) as selling and marketing "an email authentication protocol specification (called 'DMARC') that assists customers in streamlining email communications by filtering out spam, malware, and phishing emails from email inboxes."  Groeneweg stated that the company provides these services "throughout Europe, Russia, and Africa."

Groeneweg's brief refers to the European and American companies as "dmarcian Europe BV" and "dmarcian, Inc."  Swenberg refers to them as "dmarcian EU" and "dmarcian."  For simplicity, except when a quotation uses the full company names, this opinion will use "dmarcian EU" and "dmarcian."

that both were the founders of dmarcian and reclassified Swenberg as an employee, with a base salary of $140,000 annually.

The second alleged agreement, entered on February 17, 2017, provided that Draegen and his wife would own five-eighths of dmarcian's stock and Swenberg would own three-eighths, which would vest over a three-year period beginning June 13, 2016 (the start of Swenberg's work as a consultant), while "the remaining stock would be reserved as an option pool for future employees and/or investors in the company." Swenberg alleged this February 2017 agreement also provided that "the ownership interest in dmarcian EU was to be 'folded into' dmarcian (either to a merger, consolidation or other means), and in exchange Groeneweg would receive a small ownership stake in dmarcian." The complaint alleged that defendants "failed to fully execute on the February 2017 Agreement in that dmarcian did not own or hold dmarcian EU's interest at least until the time Swenberg was terminated from dmarcian. Instead, upon information and belief, Draegen and Groeneweg directly own and/or beneficially own the entire ownership interest in dmarcian EU to date, and to the detriment of dmarcian and Swenberg."

A third agreement, entered in the summer of 2017, provided Draegen and Swenberg would each be entitled to a guaranteed bonus equal to 50 percent of an ongoing "bonus pool," to be calculated as 10 percent of dmarcian's gross bookings, and an agreement entered in February 2018, provided Swenberg would be entitled to "severance pay equal to one year of his total compensation (including base salary, bonus, vesting of stock options and all benefits) in the event of his separation from dmarcian that was not for a good cause." Swenberg alleged that he was paid "an annual base salary

3

and the first installment of his share of the bonus," but "any additional bonus payments" and his severance payment remain unpaid.

In addition to the oral agreements, Swenberg alleged that he executed a written stock purchase agreement in March 2017, pursuant to which he "duly purchased 3,000,000 shares of dmarcian's Common Stock with the intent that vesting be over a three-year period."

In December 2017, suspicious that Draegen "would not allow the acquisition of the ownership interest in dmarcian EU by dmarcian," Swenberg confronted Draegen and requested that dmarcian complete the acquisition, but Draegen "failed to follow through with this promise at that time." Swenberg raised the issue several times during the first months of 2018, but "instead of being awarded with that benefit and in retaliation for making this demand, in May 2018, Draegen terminated Swenberg's employment."

Swenberg alleged that Draegen had periodically referred to "a European Union ('EU') affiliate reseller entity of dmarcian that was then operated by Groeneweg, calling it 'dmarcian Europe.'" The complaint alleged, on information and belief, that Draegen "concealed from Swenberg that he had an agreement with Groeneweg regarding dmarcian EU that conflicted with Draegen's loyalty to dmarcian and their agreement that dmarcian EU will fold into dmarcian" and "Draegen may *already have had an ownership stake* in dmarcian EU or an agreement regarding dmarcian EU that jeopardized or interfered with his fiduciary responsibilities to dmarcian." (Italics in complaint.) In December 2017 or January 2018, Groeneweg told Swenberg he and Draegen had been "negotiating the deal between dmarcian and dmarcian EU *for a long time*," and Draegen then admitted he and

4

Groeneweg "were discussing future plans for Draegen, *and not dmarcian,* to own an ownership stake in dmarcian EU."  (Italics in complaint.)

The complaint alleged that Draegen and dmarcian breached the oral agreements with Swenberg by refusing to allow him to vest on the stock options under the January 2017 agreement; failing to give him a share in dmarcian EU pursuant to the February 2017 agreement; failing to fully pay his guaranteed bonuses pursuant to the summer 2017 agreement; and failing to pay his severance pay pursuant to the February 2018 agreement.  Additionally, Swenberg alleged that he has not been reimbursed for approximately $100,000 in expenses he had advanced on behalf of the company.

Swenberg brought this suit individually and derivatively on behalf of dmarcian, alleging a total of 20 causes of action.  Two of these were specifically alleged against Groeneweg (together with Draegen):  The first cause of action, for breach of fiduciary duty, alleged Draegen and Groeneweg had a fiduciary relationship with Swenberg because all three were "partners, co-founders, and/or co-joint venturers when forming dmarcian together" and because Draegen and Groeneweg controlled the majority of the shares in the company, and breached their fiduciary duties by putting their self-interests over dmarcian's, breaching dmarcian's employment terms with Swenberg and retaliating against Swenberg for his complaints; the third cause of action, for breach of fiduciary duty of undivided loyalty, alleged Groeneweg had a duty of loyalty to dmarcian as "a reseller of dmarcian's products, and therefore a corporate partner" and as "a potential, actual or beneficial investor in dmarcian," and breached this duty by concealing Draegen's acquisition of an ownership stake in dmarcian EU.  A number of causes of action were alleged against all defendants:  Fraud/concealment, alleging "Draegen and dmarcian

5

knowingly concealed from Swenberg his ownership interest in dmarcian EU even though they knew about Draegen's conflict of interest and had a duty to disclose it to Swenberg"; negligent misrespresentation, alleging "defendants concealed and/or misrepresented" Draegen's ownership interest in dmarcian EU; declaratory relief, seeking a declaration that the oral agreements are enforceable contracts, the stock purchase agreement is enforceable "as it pertains to the vesting schedule," Swenberg "was entitled to vest in his options at a monthly rate over a period of 3 years under either the Agreements and/or the Stock Purchase Agreement," and "dmarcian and/or Swenberg has an ownership interest in dmarcian EU"; specific performance; unjust enrichment/restitution; and unlawful and/or unfair business practices. The remaining causes of action were alleged against only Draegen and/or dmarcian.

Both Draegen and Groeneweg filed motions to quash service for lack of personal jurisdiction.

In support of his opposition, Swenberg offered his own declaration and those of his attorney and of former dmarcian employee Sean Venkersammy. Counsel's declaration attached copies of material from the Internet in which, he stated, Groeneweg presented himself as a founder and manager of dmarcian without suggesting his association was with a separate entity. First, counsel stated that "[c]onsistent with Groeneweg being a part-owner of dmarcian, dmarcian's website lists Groeneweg as the General Manager of *dmarcian in Europe*, not as being affiliated with any separate entity called 'dmarcian EU' or 'dmarcian Europe.'" A copy of the "Meet Our Team" page of dmarcian's Web site shows a photograph of Groeneweg followed by his name

6

but—as it appears in our record—no indication of his specific role.[3]  Next, counsel declared that Groeneweg's LinkedIn profile lists him as "founder of dmarcian."  The attached pages from LinkedIn.com show Groeneweg with the description "General Manager Europe at dmarcian" and, under "Experience," "Co-Founder and General Manager Europe"; the text describes "dmarcian" and its business without reference to dmarcian EU or any other entity.  Counsel further states that the LinkedIn profiles of several employees who work at dmarcian EU "list in their 'Experience' section that they are actually employed at dmarcian, and two employees on the dmarcian "Meet Our Team" page list business clients headquartered and doing business in California, such as AirBnb.  As with Groeneweg, these employees' profiles refer to their employer simply as "dmarcian."  Finally, counsel's declaration states that the Web address "dmarcian-eu.com" automatically redirects to the Web site "dmarcian.com."

Swenberg's declaration stated, "I conducted conference calls along with dmarcian's United States employees to Groeneweg and/or members of his sales team.  These calls were about the business of dmarcian, including the sales process and other day-to-day business matters.  These telephone calls

---

[3] As it appears in the record on appeal, Groeneweg's photograph and name appear at the bottom of a page and the place where the description of his role and location would appear—if consistent with the presentation of other team members—is obscured by what appears to be a pop-up message on the computer screen ("We use cookies to give you the best experience on our website" followed by "I accept" and "Learn More" buttons.)  Two other general managers are depicted following Groeneweg:  "Con Lokos," followed by "General Manager APAC [¶] Melbourne, Australia" and then "Edward Carroll," followed by "General Manager Americas [¶] Asheville, USA."  Assuming the Web site uses same pattern for each of the individuals portrayed, the pop-up message beneath Groeneweg's name would obscure "General Manager Europe" and Groeneweg's location in the Netherlands.

originated in or were made to Marotta's Burlingame, California, office." Swenberg declared, "dmarcian EU acted as a reseller of dmarcian's products, and leads from dmarcian were assigned to Groeneweg and/or dmarcian EU by means of dmarcian's Customer Relations Management ('CRM') system which was operated and administered in California." Swenberg stated that "[t]he process of passing business from dmarcian to the EU sales team through the CRM software of dmarcian took place in California" and was the responsibility of an employee in California (Venkersammy), and the software was "always paid for by dmarcian itself, regardless of whether the clients were ultimately handled by Groeneweg's team in Europe." Another California employee (Reynolds) "provided employee login information to dmarcian and dmarcian EU team members through which they could view assignments that had been given to them by Venkersammy."

According to Swenberg, "[t]he sales referral process explained above was reviewed and discussed periodically over the phone with me in California and others, and Groeneweg himself had input on the operating process during those calls. Groeneweg also periodically directed his employees to attend to business in San Francisco on his behalf and/or on behalf of dmarcian EU, including Vincent Schonau." Draegen hired an individual, who was paid by dmarcian, to recruit engineers in Bulgaria who then operated under the auspices of dmarcian, and Groeneweg paid the same Bulgarian engineers to develop software that is used by dmarcian, from which all dmarcian clients, including those in California, benefit. "Groeneweg himself once threatened me saying that if dmarcian and/or Draegen did not give him his preferred terms in a negotiation for a stake in the company, Groeneweg would have a claim for intellectual property against Draegen and/or dmarcian for the appropriation of this software by dmarcian."

8

Swenberg stated that the dmarcian-eu.com Web site redirects to dmarcian.com, "which suggests that the two domains are owned by the same entity, and I believe Draegen personally registered both domains based on statements that he has made to me." Also, according to Swenberg, "[a]ll the service infrastructure for dmarcian and dmarcian EU is managed from the United States by dmarcian, and though customer data is held in a cloud computing system, data from clients located in the EU may be held in the same data center as the data belonging to clients within the US, including clients located in California."

Venkersammy's declaration stated that he was an "Account Services Manager" and "Community Advocate" for dmarcian until October 2019, and managed "a global pipeline of over 900 new account signups per month" through dmarcian's website." Prospective clients would fill out a form on the Web site and some would ultimately be "serviced by employees operating under the umbrella of dmarcian EU." Through the Web site, Venkersammy "directed a portion of those sales leads, which were generated through dmarcian's Customer Relationship Management system, to dmarcian EU, which was originally a reseller of dmarcian's product, and dmarcian received a percentage of the payment from those referrals." Venkersammy stated that "[s]ometime after 2017, dmarcian and dmarcian EU merged and became a single entity," "Groeneweg became a part owner or other stakeholder in dmarcian around that time," "[u]pon information and belief, around that time, Groeneweg merged dmarcian EU with dmarcian under an agreement that was to be construed under the laws of the State of California," and "Groeneweg and/or dmarcian EU have merged with dmarcian for all purposes, and therefore there is no distinction between the two, and

Groeneweg, as the General Manager of dmarcian, has systematic business contacts with California where dmarcian's corporate headquarters are."

Groeneweg's declaration in support of his reply to Swenberg's opposition stated he is a Dutch citizen and has lived in the Netherlands all his life, he has never been an American citizen, does not own or operate a business in California, does not conduct business or personally direct any business activities within California, and does not own real property, pay taxes, or vote in California. Groeneweg declared it would be "a significant burden" to be forced to defend this lawsuit in the United States, as he lives in the Netherlands and has "no significant contacts with the United States."

Groeneweg further declared he is "an indirect 25% shareholder of dmarcian Europe BV, a company registered under the laws of the Netherlands." According to his declaration, "Mailmerk BV, currently known as dmarcian Europe B.V., was founded March 20, 2013, by The Digital Xpedition (TDX) Holding B.V. and BM&C B.V."; "dmarcian Europe BV is an entirely separate entity from dmarcian, Inc." and "does not conduct business in California"; the two companies have not merged; Groeneweg has never had an ownership interest in dmarcian; and dmarcian EU "runs its full business processes (such as the CRM program, administration, and project management) in Exact Online, a system operated and administered in the Netherlands" that is "a completely separate system not used by dmarcian, Inc." Groeneweg declared, "I never paid for the services of engineers to develop new software for dmarcian, Inc. and its clients. Instead, dmarcian Europe BV paid engineers to develop new software." Groeneweg further stated that he uses " 'co-founder' " on his LinkedIn profile "to signify that I am the co-founder of dmarcian Europe BV."

Draegen also declared that Groeneweg has never held an ownership interest in dmarcian. He stated that he and Groeneweg "considered and discussed . . . the possibility of merging dmarcian, Inc. with dmarcian Europe BV" but "did not finalize any agreement and no merger occurred." According to Draegen's declaration, "[t]oday, dmarcian, Inc. and dmarcian Europe BV remain separate entities. Groeneweg is not and never has been a shareholder in dmarcian, Inc., nor does he have any affiliation with dmarcian, Inc." Draegen declared, "dmarcian, Inc. and dmarcian Europe BV are distinct separate entities, owned and operated separately. They share the dmarcian name and there is one dmarcian.com Web site to keep the customer experience simple. Once a customer makes an account and selects its geographic region, the customer is directed to the appropriate entity depending on its geography. The dmarcian brand website only mentions 'dmarcian Europe BV' on the 'Contact US' page, which also identifies the other legal entities involved." Draegen stated that the assertion dmarcian paid for the CRM software used by dmarcian EU is false and that '[o]nce customer leads are assigned, dmarcian Europe BV maintains its own CRM that is entirely distinct from the CRM used by dmarcian, Inc.' "

Draegen further stated that Venkersammy was terminated from his employment with dmarcian "for being unable to perform the functions of his job duties" and, while an employee, "was not involved in any discussions or decisions regarding company mergers or acquisitions. Indeed, such discussions or decisions were well above his pay grade and he would not have been privy to such discussions or decisions. Any representation to the

11

contrary is false. . . . Venkersammy's statements are self-serving (having been recently terminated from the company) and false."[4]

The trial court denied Draegen's motion to quash service. The court granted Groeneweg's motion and ordered the complaint dismissed as to Groeneweg. Swenberg filed a timely notice of appeal.

## DISCUSSION

"California courts may exercise jurisdiction over nonresidents 'on any basis not inconsistent with the Constitution of this state or of the United States.' (Code Civ. Proc., § 410.10.) The statute 'manifests an intent to exercise the broadest possible jurisdiction, limited only by constitutional considerations. [Citations.]' (*Sibley v. Superior Court* [(1976)] 16 Cal.3d [442,] 445.) A state may constitutionally exercise personal jurisdiction over a nonresident as long as he or she has 'minimum contacts' with that forum such that 'maintenance of the suit does not offend "traditional notions of fair play and substantial justice." [Citations.]' (*Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316.)" (*Taylor-Rush v. Multitech Corp.* (1990) 217 Cal.App.3d 103, 112 (*Taylor-Rush*); *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262 (*Pavlovich*.)

"When jurisdiction is challenged by a nonresident defendant, the burden of proof is on the plaintiff to demonstrate that sufficient 'minimum contacts' exist between the defendant and the forum state to justify imposition of personal jurisdiction." (*Taylor-Rush, supra,* 217 Cal.App.3d at p. 112, quoting *Sibley v. Superior Court, supra,* 16 Cal.3d at p. 445.) The plaintiff must prove the factual basis justifying exercise of jurisdiction by a preponderance of the evidence. (*BBA Aviation PLC v. Superior Court* (2010)

---

[4] As Draegen's motion is not at issue on this appeal, we omit discussion of additional details pertaining solely to the court's jurisdiction over him.

12

190 Cal.App.4th 421, 428 (*BBA Aviation*).) "The plaintiff must provide specific evidentiary facts, through affidavits and other authenticated documents, sufficient to allow the court to independently conclude whether jurisdiction is appropriate" and "cannot rely on allegations in an unverified complaint or vague and conclusory assertions of ultimate facts." (*Strasner v. Touchstone Wireless Repair & Logistics, LP* (2016) 5 Cal.App.5th 215, 222; *BBA Aviation,* at p. 428; *In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 110.)

If the plaintiff meets this burden, the burden shifts to the defendant to demonstrate that the exercise of jurisdiction would be unreasonable. (*Pavlovich, supra,* 29 Cal.4th at p. 273.) "When the jurisdictional facts are not in dispute, personal jurisdiction is a legal question for de novo review. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062 (*Snowney*).) If the jurisdictional facts are conflicting, we review the lower court's factual determinations for substantial evidence, but still review its legal conclusions de novo. (*Dorel Industries, Inc. v. Superior Court* (2005) 134 Cal.App.4th 1267, 1273.)" (*BBA Aviation, supra,* 190 Cal.App.4th at p. 429.)

" 'Under the minimum contacts test, "an essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that State." ' " (*Epic Communications, Inc. v. Richwave Technology, Inc.* (2009) 179 Cal.App.4th 314, 327 (*Epic Communications*), quoting *Pavlovich, supra,* 29 Cal.4th at p. 268.) " 'The "substantial connection" [citations] between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.* [Citations.]' (*Asahi Metal Industry Co. v. Superior*

13

*Court* (1987) 480 U.S. 102, 112.) A defendant's physical presence in the state is not required, as long as his or her efforts were " 'purposely directed' " toward residents of that state. (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 476; *St. Joe Paper Co. v. Superior Court* (1981) 120 Cal.App.3d 991, 997.) Thus, personal jurisdiction may be exercised over a defendant who has caused an effect in the forum state by an act or omission occurring elsewhere. (*McGee* v. *International Life Ins. Co.* (1957) 355 U.S. 220, 223–224; *Sibley v. Superior Court, supra*, 16 Cal.3d at pp. 445–446; *Buckeye Boiler Co. v. Superior Court* (1969) 71 Cal.2d 893, 898–899.)" (*Taylor-Rush, supra,* 217 Cal.App.3d at p. 112.) But there must be evidence the nonresident defendant intentionally targeted his or her conduct *at the forum state* and not just at a plaintiff who lives in that state. (*Burdick v. Superior Court* (2015) 233 Cal.App.4th 8, 13, 25 (*Burdick*); *Walden v. Fiore* (2014) 571 U.S. 277, 288 (*Walden*).)

Personal jurisdiction may be general or specific. (*Epic Communications, supra,* 179 Cal.App.4th at p. 327.) "General jurisdiction exists where the defendant has such pervasive contacts with the forum state that it is fair to subject it to jurisdiction for all purposes. (*DVI, Inc. v. Superior Court* [(2002)] 104 Cal.App.4th [1080,] 1090, 1097.) . . . [¶] Specific jurisdiction exists when, though the defendant lacks such pervasive forum contacts that he may be treated as present for all purposes, it is nonetheless proper to subject him to the forum state's jurisdiction in connection with a particular controversy." (*Epic Communications, supra,* 179 Cal.App.4th at p. 327.) " 'When determining whether specific jurisdiction exists, courts consider the " 'relationship among the defendant, the forum, and the litigation.' " [Citations.] A court may exercise specific jurisdiction over a nonresident defendant only if: (1) "the defendant has purposefully availed

14

himself or herself of forum benefits" [citation]; (2) "the 'controversy is related to or "arises out of" [the] defendant's contacts with the forum' " [citations]; and (3) " 'the assertion of personal jurisdiction would comport with "fair play and substantial justice" ' " [citations].' " (*Snowney, supra,* 35 Cal.4th 1054, 1062, quoting *Pavlovich, supra,* 29 Cal.4th at p. 269.)

## A.

The trial court determined that Swenberg "failed to carry his burden of establishing, by a preponderance of the evidence, that Groeneweg had sufficient minimum contacts with California to support the exercise of personal jurisdiction over him. [Swenberg] has not demonstrated that Groeneweg is an officer or director of dmarcian, or that he has any interest in dmarcian, as opposed to dmarcian EU. Further, [Swenberg] has not demonstrated that Groeneweg attended any meetings in California relating to the alleged agreements between [Swenberg] and dmarcian. Ultimately, [Swenberg] has provided no evidence indicating that Groeneweg engaged in any tortious conduct while in California, or that his alleged tortious conduct outside California was purposefully directed at [Swenberg] in California and had a tortious effect here."

As explained in its decision, the trial court found Swenberg's allegations refuted by the declarations of Groeneweg and Draegen. The trial court described Swenberg as maintaining that Groeneweg and/or dmarcian EU had merged with dmarcian, so there was no distinction between the two entities, and that Groeneweg, as the general manager of dmarcian, had systematic business contacts with California. The court then explained that Groeneweg denied he had any ownership interest in dmarcian, denied dmarcian and dmarcian EU had merged, and disputed the claims that he directed his employees to attend to business in San Francisco on behalf of

15

himself or dmarcian EU, and that dmarcian EU used the same CRM system operated by dmarcian in California. The court quoted portions of Groeneweg's declaration supporting these points, as well as Groeneweg's declarations that he did not own or operate a business in California, conduct business or personally direct business activities in California, or own property, pay taxes, or vote in California. Having noted that Swenberg relied on Venkersammy's declaration for the proposition that dmarcian and dmarcian EU had merged, the trial court also quoted Draegen's declaration stating that Venkersammy's position at dmarcian did not make him privy to discussions or decisions about company mergers or acquisitions, and that Venkersammy's assertion that dmarcian and dmarcian EU had merged was false.

Arguing that he submitted a preponderance of evidence showing it was appropriate for the trial court to exercise personal jurisdiction over Groeneweg, Swenberg first maintains the trial court erred in taking at face value the "vague, unsupported assertions" of Draegen and Groeneweg when those assertions could and should have been submitted with documentary evidence. Swenberg relies upon *Ziller Electronics Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1232–1233 (*Ziller*), which held the plaintiff failed to meet its burden to demonstrate the necessary jurisdictional facts with verified declarations consisting "primary of vague assertions of ultimate facts rather than specific evidentiary facts permitting a court to form an independent conclusion on the issue."

Groeneweg points out that *Ziller* was discussing deficiencies in the showing made by the plaintiff, who had the burden of demonstrating the basis for jurisdiction. But Swenberg's point in relying on *Ziller* is simply that declarations providing "vague assertions of ultimate facts rather than specific

16

evidentiary facts permitting a court to form an independent conclusion on the issue" are insufficient to establish the matters stated. (*Ziller, supra,* 206 Cal.App.3d at p. 1233.) This is as true for a defendant's declaration as for a plaintiff's declaration. While it was Swenberg's burden to establish the jurisdictional facts by a preponderance of the evidence, deficiencies in Groeneweg's declaration would undermine his attempt to dispute facts properly supported by Swenberg's showing. Swenberg's argument is that the trial court erred in relying upon vague and unsupported facts in Groeneweg's and Draegen's declarations to find disputes over facts that did not exist, as well as that the court ignored Groeneweg's failure to address many facts establishing what Swenberg sees as Groeneweg's "pervasive" contacts with California.

### B.

Swenberg contends Groeneweg had sufficient contacts with California to support the exercise of both general and specific jurisdiction. We find it necessary to discuss only the latter. As we have said, specific jurisdiction depends on three factors: whether the defendant " 'purposefully availed himself or herself of forum benefits,' " whether the controversy ' "is related to or 'arises out of' [the] defendant's contacts with the forum" ' and whether the assertion of personal jurisdiction ' "would comport with 'fair play and substantial justice.' " ' " (*Pavlovich, supra,* 29 Cal.4th at p. 269.)

" ' "The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs [its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receives, to be subject to the court's jurisdiction based on" [its] contacts with the forum.' (*Pavlovich, supra,* 29 Cal.4th at p. 269, quoting *U.S. v. Swiss American Bank, Ltd.* (1st

17

Cir. 2001) 274 F.3d 610, 623–624.) Thus, purposeful availment occurs where a nonresident defendant ' "purposefully direct[s]" [its] activities at residents of the forum' (*Burger King* [*Corp. v. Rudzewicz*], *supra,* 471 U.S. at p. 472), ' "purposefully derive[s] benefit" from' its activities in the forum (*id.* at p. 473,), 'create[s] a "substantial connection" with the forum' (*id.* at p. 475), ' "deliberately" has engaged in significant activities within' the forum (*id.* at pp. 475–476), or 'has created "continuing obligations" between [itself] and residents of the forum' (*id.* at p. 476). By limiting the scope of a forum's jurisdiction in this manner, the ' "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts. . . .' (*Id.* at p. 475.) Instead, the defendant will only be subject to personal jurisdiction if ' "it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the state." ' (*Pavlovich, supra*, 29 Cal.4th at p. 269, quoting *World-Wide Volkswagen, supra,* 444 U.S. at p. 297.)" (*Snowney, supra,* 35 Cal.4th at pp. 1062–1063.)

The " 'minimum contacts' analysis looks to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there.' " (*Zehia v. Superior Court* (2020) 45 Cal.App.5th 543, 554–555, quoting *Walden, supra,* 571 U.S. at p. 285.) " '[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.' " (*David L. v. Superior Court* (2018) 29 Cal.App.5th 359, 372, quoting *Walden,* at p. 285.) "[T]o find specific jurisdiction, a court must look to the defendant's 'own' suit-related contacts

18

with the forum to see if they create a '*substantial connection with the forum State,*' not just 'with persons who reside there.' " (*David L.*, at p. 372, quoting *Walden,* at pp. 284–285.)

Swenberg maintains that Groeneweg "engaged in many purposeful acts with California, in that he was "engaged constantly with dmarcian—a company headquartered in California—by servicing clients derived from dmarcian's CRM system, assisting with the operations of dmarcian day to day, and directing engineers to develop software for the California-based company" and committed a tort aimed at a California resident (Swenberg) by making a threat over the phone and "fraudulently concealing his relationship with dmarcian and/or Draegen from Swenberg."

The trial court expressly accepted Groeneweg's and Draegen's declarations that Groeneweg was not an officer or director of dmarcian and did hold an ownership interest in that company, and that the two companies did not merge and/or operate as a single entity. The only evidence Swenberg offered to support his allegations to the contrary was Venkersammy's declaration. Venkersammy formerly worked as "an Account Services Manager and Community Advocate" for dmarcian, managing the "global pipeline" of new account signups on dmarcian's Web site and directing "a portion of those sales leads" to dmarcian Europe." Neither his declaration nor anything else in the record provides any explanation how his position at the company gave him access to information concerning a merger with dmarcian Europe or Groeneweg's ownership status. His assertions on these points were flatly contradicted by Groeneweg and Draegen, based on their personal knowledge and positions as, respectively, general manager of dmarcian Europe and CEO of dmarcian. We cannot find the trial court erred

19

in crediting their evidence and rejecting Venkersammy's unsupported statements.

Although we therefore agree that Swenberg failed to support his allegations that Groeneweg *in fact* was the general manager of dmarcian or that the two companies operated as one, this is only the beginning of the inquiry.

Swenberg presented compelling evidence that Groeneweg publicly presented himself as one of the leaders of dmarcian, with no hint there was a distinction between dmarcian and any other entity Groeneweg was associated with. It is undisputed that dmarcian and dmarcian EU shared a Web site; accordingly, anyone who attempted to access a Web site for dmarcian EU would be redirected to the dmarcian Web site. On the dmarcian Web site, Groeneweg appears immediately below Draegen, the CEO (identified by name and location in the United States) and above two individuals identified as "General Manager APAC [¶] Melbourne, Australia" and "General Manager Americas [¶] Asheville, USA." Although the exhibit in the record on appeal is incomplete, in that the text beneath Groeneweg's name is obscured by what appears to be a pop-up message on the computer screen,[5] it is obvious from the format of this section of the Web site that the hidden information would read—as Swenberg's attorney indicated in his declaration—"General Manager Europe." Other employees are similarly presented with photographs, names, and locations in various parts of the world. The obvious impression imparted by the Web site is a company with operations run by regional managers in different geographic areas.

---

[5] The text reads, "We use cookies to give you the best experience on our Web site," followed by "I accept" and "Learn More" buttons.

The same impression is conveyed by Groeneweg's LinkedIn profile, which describes him as "General Manager Europe at dmarcian" and, under "Experience," "Co-Founder and General Manager Europe." The accompanying text describes "dmarcian" and its business without reference to dmarcian EU or any other entity: "Companies use dmarcian to rapidly and accurately deploy DMARC . . ."; "The mission of dmarcian is to fix the email ecosystem"; "dmarcian has 19,000 customers . . . ." Other dmarcian EU employees' LinkedIn pages similarly describe the business of "dmarcian" and provide as examples of dmarcian's customers a world-wide list including companies headquartered and doing business in California, such as AirBnb and GAP.[6]

It is also undisputed that dmarcian EU obtained prospective customers through a process in which customers who contacted the Web site, if located in dmarcian EU's geographical area, were directed to dmarcian EU by a California-based employee of *dmarcian.* The trial court accepted Groeneweg's declaration that dmarcian EU uses separate business systems from dmarcian, including the CRM system, as refuting Swenberg's "claim that dmarcian EU uses the same customer relations management system that is operated and administered by dmarcian in California. But Groeneweg's declaration did not respond to, much less contradict, Swenberg's evidence that the *dmarcian* CRM was used to direct prospective customers to dmarcian EU; Venkersammy's declaration on this point was within the purview of his employment; and Draegen confirmed that dmarcian EU used a

_____

[6] The LinkedIn profile of one of these employees describes him as "Account Director DMARC at dmarcian Europe," but his "experience" section reads "Account Director DMARC [¶] dmarcian"; two others are described as "Account Director DMARC at dmarcian Europe" both in the initial profile and under "experience."

21

distinct CRM *"once customer leads are assigned."* Neither Groeneweg nor Draegen denied Venkersammy's assertion that dmarcian receives a percentage of the payments from customers referred to dmarcian Europe. That dmarcian EU's Internet presence was a shared Web site, administered by dmarcian in California, where a dmarcian employee would assign prospective customers to dmarcian EU, indicates at the very least a strong business association between dmarcian EU and dmarcian: dmarcian was dmarcian EU's source for customers contacting the company through the Web site.

Swenberg stated in his declaration that he participated in conference phone calls between dmarcian employees in California and Groeneweg and/or his sales team members "about the business of dmarcian, including the sales process and other day-to-day business matters." Groeneweg did not directly deny this assertion. Groeneweg declared generally that he does not "conduct business" in California, but this general statement does not suffice to refute Swenberg's specific one.

Similarly, Groeneweg did not wholly deny Swenberg's declaration that Groeneweg paid engineers who "operated under the auspices of dmarcian" to develop software used by dmarcian for the benefit of all dmarcian's clients. Groeneweg declared that *he* did not pay engineers "to develop new software for dmarcian, Inc. and its clients" but "[i]nstead, dmarcian Europe VB paid engineers to develop new software." That Groeneweg did not personally pay the engineers, as opposed to dmarcian EU doing so, does not negate Swenberg's point, if in fact the software was provided for dmarcian's use. Groeneweg's declaration does not say who the software was developed for or used by, and therefore does not negate Swenberg's assertion that it was used by dmarcian.

22

By publicly presenting himself as a leader of dmarcian, a company headquartered in California, having dmarcian EU's web address automatically route to dmarcian's Web site, administered in California, and receiving prospective customers directed to dmarcian EU by a dmarcian employee in California, Groeneweg " ' "purposely availed himself . . . of forum benefits" ' " and " ' "purposefully derive[d] benefit" from' [his] activities in the forum." (*Snowney, supra,* 35 Cal.4th at pp. 1062–1063.) A California court's exercise of jurisdiction over Groeneweg in litigation related to his role in dmarcian can hardly be seen as based on " ' "random," "fortuitous," or "attenuated" contacts.' " (*Ibid.*) Having established and made economic use of a relationship with a California company and its employees, Groeneweg could reasonably expect to be subject to the jurisdiction of California courts in litigation connected to this relationship.

Swenberg's claims clearly relate to Groeneweg's business relationship with dmarcian: The gist of Swenberg's complaint is that he had an agreement with Draegen for dmarcian to acquire an ownership share in dmarcian EU that was violated by Draegen and Groeneweg secretly negotiating a deal for Draegen to acquire the interest personally, thereby defeating Swenberg's expectation of an ownership interest in dmarcian EU. He further alleged that his complaints about this situation resulted in retaliation including termination of his position at dmarcian.

"A state may exercise specific jurisdiction over a nonresident who purposefully avails himself or herself of forum benefits, because the state has 'a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. [Citations.] Moreover, where individuals "purposefully derive benefit" from their interstate activities [citation] it may well be unfair to allow them to escape having to

23

account in other States for consequences that arise proximately from such activities.' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 447, quoting *Burger King Corp. v. Rudzewicz, supra,* 471 U.S. at pp. 473–474.)

In granting Groeneweg's motion to quash, the trial court relied upon *Taylor-Rush, supra,* 217 Cal.App.3d 103, which it viewed as analogous to the present case. *Taylor-Rush,* however, was narrowly focused on jurisdiction based solely on nonresident defendants' allegedly tortious conduct committed within California or directed at a forum resident—that is, the alleged misconduct itself was the defendants' only connection to California. In that case, the California plaintiff sued nonresident corporate officers and directors of a nonresident corporation for fraud and breach of contract, alleging she was induced by fraudulent representations to transfer her wholly owned California corporation in exchange for stock in, and an employment agreement with the defendant corporation. The *Taylor-Rush* court held sufficient contacts were established for personal jurisdiction over two defendants, one because he made the relevant misrepresentations and nondisclosures while in California and the other because, although he met with the plaintiff in New York, his "alleged tortious conduct . . . was purposely directed at [plaintiff] in California and had a tortious effect here." (*Id.* at p. 114.) Significantly, neither of these defendants denied making the alleged misrepresentations and nondisclosures; they only disclaimed liability on the theory that all their dealings with plaintiff were in their capacity as corporate officer or director—a defense the *Taylor-Rush* court rejected. (*Ibid.*) As to three other defendants, the court held the plaintiff made an insufficient showing of minimum contacts in that there was no evidence they participated in or directed any tortious act or omission, as the plaintiff

24

alleged, they conspired with the other defendants, but her declaration did not mention them, and the defendants' declarations stated they did not participate in the negotiations during which the plaintiff claimed she was defrauded.  (*Ibid.*)

Swenberg contends Groeneweg is actually more like the defendants in *Taylor-Rush* as to whom jurisdiction was found rather than those for whom minimum contacts were not established, because the complaint alleged various tortious acts by Groeneweg and the evidence Swenberg presented "explicitly mentioned" Groeneweg.[7]  This argument is not particularly compelling, as Swenberg cannot establish jurisdictional facts with allegations of an unverified complaint (*Strasner v. Touchstone Wireless Repair & Logistics, LP, supra,* 5 Cal.App.5th at p. 222; *BBA Aviation, supra,* 190 Cal.App.4th at p. 428; *In re Automobile Antitrust Cases I & II, supra,* 135 Cal.App.4th at p. 110) and much of the evidence Swenberg cites relates to Groeneweg's business contacts discussed above, not to tortious conduct itself establishing the requisite forum connection.  But this is of little import, because—unlike *Taylor-Rush*—Swenberg's evidence showed sufficient minimum contacts as discussed above.

The remaining requirement for specific jurisdiction is that " ' " 'the assertion of personal jurisdiction would comport with "fair play and

---

[7] Specifically, Swenberg refers to allegations that Groeneweg was involved in making a "sham, forced buyback of Swenberg's ownership stake in dmarcian," had a fiduciary duty to Swenberg as partner, co-founder and co-joint venturer in forming dmarcian, "endeavored to control dmarcian's corporate activities to deprive Swenberg of the benefits of his ownership stake in that company," engaged in conduct intended to reduce dmarcian's ability to generate a profit, reducing Swenberg's return on his investment, and "allegations of fraudulent concealment, fraudulent negligent misrepresentation, unjust enrichment, and unfair business practices."

substantial justice" ' " [citations].' " (*Snowney, supra,* 35 Cal.4th at p. 1062, quoting *Pavlovich, supra,* 29 Cal.4th at p. 269.) More than 30 years ago, the United States Supreme Court observed—quoting its words from decades earlier—that "because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." (*Burger King Corp. v. Rudzewicz, supra,* 471 U.S. at p. 474, quoting *McGee v. International Life Insurance Co., supra,* 355 U.S. at pp. 222–223.) That point is all the more obvious now. Groeneweg chose to make the Internet presence of dmarcian EU, and its ability to obtain customers from on-line contacts, depend upon the services of a California based company. We see no unfairness in requiring him to subject himself to the jurisdiction of California courts in litigation involving his relationship with that California company and its employees.

## DISPOSITION

The judgment is reversed, and the matter remanded for further proceedings consistent with the views expressed in this opinion. Costs to Swenberg.

_____
KLINE, P.J.

WE CONCUR:


_____
RICHMAN, J.


_____
MILLER, J.

*Swenberg v. Dmarcian, Inc., et al.* (A159148)

Filed 8/30/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHARLES E. SWENBERG,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DMARCIAN, INC., et al.,<br><br>    Defendants and Respondents. | A159148<br><br>(San Mateo County<br>Super. Ct. No. 19-CIV-02896)<br><br>**ORDER CERTIFYING<br>OPINION FOR PUBLICATION** |

**THE COURT:**

The opinion in the above-entitled matter filed on July 30, 2021, was not certified for publication in the Official Reports.  For good cause the request for publication by appellant is granted.


Date: _____          _____

                                                        Kline, P.J.

1

Trial Court:                        San Mateo County Superior Court

Trial Judge:                        Hon. Leland Davis III


Attorneys for Appellant:            Peretz & Associates
                                    Yosef Peretz
                                    Ruth Israely

Attorneys for Respondents:          Hoge, Fenton, Jones & Appel
                                    Alison P. Buchanan
                                    Laura C. Riparbelli